# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 7, 2008       Decided December 23, 2008

No. 07-5318

DWIGHT LOVING,
APPELLANT

v.

DEPARTMENT OF DEFENSE AND DEPARTMENT OF THE ARMY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 06cv01655)

*Seth A. Watkins* argued the cause for appellant. With him on the briefs was *Charles F. Schill*.

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Mark B. Stern*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:   Convicted of capital murder by a military court-martial, appellant filed suit under the Freedom of Information Act seeking disclosure of Department of Defense and Army memoranda prepared for the President in connection with his statutory review of appellant's death sentence.   The district court found the requested documents exempt from disclosure under FOIA Exemption 5 and granted the government's motion for summary judgment.   For the reasons set forth in this opinion, we affirm.

**I.**

Under Article 71(a) of the Uniform Code of Military Justice, the President must "approve[]" all court-martial death sentences before they are carried out.   10 U.S.C. § 871(a) ("If the sentence of the court-martial extends to death, that part of the sentence providing for death may not be executed until approved by the President.").   The Rules for Courts-Martial specify procedures for transmitting military death penalty cases to the President, requiring the Judge Advocate General to provide all court records and his or her recommendation to the Secretary of the Army "for the action of the President." MANUAL FOR COURTS-MARTIAL, UNITED STATES, R.C.M. 1204(c)(2) (2005 ed.), *available at* http://www.loc.gov/rr/frd/Military_Law/pdf/manual-2005.pdf.

A general court-martial sentenced appellant, Army Private Dwight Loving, to death after finding him guilty of felony murder, premeditated murder, attempted murder, and robbery.   The United States Supreme Court affirmed the capital sentence.   *See Loving v. United States*, 517 U.S. 748, 774 (1996).   Proceeding under the Freedom of Information Act, 5 U.S.C. § 552, Loving asked the Department of Defense and the Army to disclose all records concerning the general

procedures for transmitting military death penalty cases to the President, as well as all records concerning Loving's death sentence in particular. While these requests were pending, the Secretary of the Army forwarded Loving's case to the President for action under Article 71(a). Learning of the Secretary's action and having received no response to his FOIA requests, Loving initiated administrative appeals with both the Department of Defense and the Army. The Army never responded. The Defense Department did respond, releasing 133 pages and informing Loving that it was withholding an additional 104 pages under, among other things, FOIA Exemption 5, § 552(b)(5), which allows agencies to withhold documents protected by traditional discovery privileges, *see Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006). Loving then filed a second administrative appeal with the Department of Defense. When the Department failed to respond, Loving filed suit under FOIA, leading the two agencies to release hundreds of documents and withhold many others. The agencies also filed *Vaughn* indexes describing the withheld documents, *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), and moved for summary judgment. Loving narrowed his request to ten documents and cross-moved for summary judgment to compel disclosure. After the two agencies identified six of these ten documents as "drafts," Loving narrowed his request to the four remaining documents. The disclosure of these four documents was the only matter disputed in the district court and is the only issue before us.

As described in the *Vaughn* indexes, two of the disputed documents reflect the sequential transmission of Loving's case—and recommendations on it—to the President from the Army Judge Advocate General and the Secretary of the Army. The first step in this sequence, Document 408, is a

memorandum from the Army Judge Advocate General to the Secretary of the Army, offering "advice outlining the PVT Loving case in detail and providing a recommendation whether the [Secretary of the Army] should recommend approval of the death penalty to the President." Col. Flora D. Darpino Decl. Attach., Mar. 30, 2007. Document 499, in turn, is a one-page memorandum from the Army Secretary forwarding Document 408 to the President, *see* Darpino Decl. ¶ 33, and providing its own "recommendation regarding whether or not PVT Loving's death sentence should be approved," Darpino Decl. Attach. The third disputed record, Document 86, is a memorandum from the Defense Secretary to the President concerning "Military Court-Martial Capital Case Forwarded for Action, *United States v. Dwight J. Loving*." Robert E. Reed Decl. Ex. A, Mar. 27, 2007. Finally, Document 87 is a one-page memorandum from the Department of Defense Office of General Counsel to the White House Counsel concerning "The President's Action in Two Military Capital Cases." Reed Decl. Ex. A.

Finding Documents 408, 499, and 86 protected by the presidential communications privilege and Document 87 protected by the deliberative process privilege, the district court concluded that FOIA Exemption 5 shielded each of the disputed documents from disclosure. *See Loving v. Dep't of Def.*, 496 F. Supp. 2d 101, 107–09 (D.D.C. 2007). It therefore granted the government's motion for summary judgment and denied Loving's. *Id.* at 110.

Loving now appeals. We review the district court's summary judgment ruling de novo, remaining "mindful that the 'burden is on the agency' to show that requested material falls within a FOIA exemption," and affirming only if we detect no genuine issue of material fact. *Petroleum Info.*

*Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting § 552(a)(4)(B)).

## II.

FOIA directs that "each agency, upon any request for records . . . shall make the records promptly available to any person" unless the requested records fall within one of the statute's nine exemptions. § 552(a)(3)(a). Exemption 5, the only exemption at issue here, allows the government to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." § 552(b)(5). As we have explained, Exemption 5 "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant"—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege—and excludes these privileged documents from FOIA's reach. *Baker & Hostetler LLP*, 473 F.3d at 321. Because Exemption 5 covers "those documents, and only those documents, normally privileged in the civil discovery context," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975), it does not protect documents that are "'routinely' or 'normally' disclosed" in civil discovery, *Dep't of Justice v. Julian*, 486 U.S. 1, 12 (1988) (quoting *FTC v. Grolier Inc.*, 462 U.S. 19, 26 (1983)).

Exemption 5 incorporates two executive privileges that are relevant here: the presidential communications privilege and the deliberative process privilege. *See Baker & Hostetler LLP*, 473 F.3d at 321. The presidential communications privilege, a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 (1974), preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions

confidentially, *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004).  As such, the privilege protects "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President."  *Id.* at 1114.  The privilege covers documents reflecting "presidential decisionmaking and deliberations," regardless of whether the documents are predecisional or not, and it covers the documents in their entirety.  *In re Sealed Case*, 121 F.3d 729, 744–45 (D.C. Cir. 1997).

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal quotation marks omitted).  For the deliberative process privilege to apply, the material must be "predecisional" and "deliberative."  *In re Sealed Case*, 121 F.3d at 737.  Unlike the presidential communications privilege, the deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must.  *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).

In support of his claim to the requested documents, Loving relies on *Department of Justice v. Julian*, 486 U.S. 1 (1988), in which the Supreme Court held that Exemption 5 does not protect presentence investigation reports from disclosure to prisoners who are the subjects of the reports.  Insisting that the President's action under Article 71(a)

represents the "ultimate sentencing" in a military capital case, Appellant's Opening Br. 11, Loving argues that the documents he seeks are akin to the presentence investigation reports at issue in *Julian*. If we accept Loving's premise, his rationale is simple enough: these documents, like the presentence investigation reports at issue in *Julian*, contain sentencing recommendations. Indeed, although the government disputes Loving's characterization of the President's Article 71(a) authority, it denies neither the advisory nature of these documents nor the role they play in Article 71(a) actions.

But the analogy to *Julian* requires a second step. In *Julian* the Court relied on the fact that the government had previously shared the presentence investigation reports at issue with the requesters—two prisoners seeking access to their own reports—and that Federal Rule of Criminal Procedure 32(c), as well as the Parole Act, 18 U.S.C. § 4208(b) (1982), required as much. 486 U.S. at 11–14. Because of this, the Court concluded, the documents were "routinely available" to the prisoners, if not the public at large. *Julian*, 486 U.S. at 13 (internal quotation marks omitted). Thus, although the Court assumed that the documents would be privileged and exempt from disclosure if third parties were to request them, *see* 486 U.S. at 12–14, it concluded that there "simply [was] *no* privilege preventing disclosure" to the prisoners themselves. *Id.* at 13–14; *see also id.* at 13 ("Congress has strongly intimated, if it has not actually provided, that no such privilege should exist.").

Loving argues that the same is true here, though the law otherwise compelling disclosure, he contends, comes not from statute or rule of criminal procedure (as in *Julian*) but from the Constitution itself. Specifically, Loving relies on *Gardner v. Florida* for the proposition that a defendant is "denied due

process of law when the death sentence [i]s imposed . . . on the basis of information which [the defendant] ha[s] no opportunity to deny or explain." 430 U.S. 349, 362 (1977). Because the requested documents contain the precise kind of "capital sentencing recommendation[s]" that "would routinely or normally be available to [him] in order for the capital sentencing process to satisfy due process of law," Loving contends that the documents he requests are "routinely available" to him within the meaning of *Julian* and therefore subject to disclosure under FOIA. Appellant's Opening Br. 23.

We need not decide whether *Gardner* gives Loving the right he claims, for Loving's constitutional rights as a capital prisoner affect the merits of his FOIA request only if *Julian* in fact applies to this case. It does not. Although the Court suggested in *Julian* that FOIA sometimes compels the government to comply with one person's request for disclosure even though it could properly refuse an identical request from anyone else, the Court has since emphasized that FOIA rarely permits such distinctions. In *Department of Justice v. Reporters Committee for the Freedom of the Press*, the Court clarified that the requester's identity matters only where, as in *Julian*, "the objection to disclosure is based on a claim of privilege and the person requesting disclosure is the party protected by the privilege." 489 U.S. 749, 771 (1989); *see also United Techs. Corp. v. FAA*, 102 F.3d 688, 692 (2d Cir. 1996) ("*Julian* applies only where the Government's 'objection to disclosure is based on a claim of a privilege and the person requesting disclosure is the party protected by the privilege. . . .'" (quoting *Reporters Comm.*, 489 U.S. at 771)). Otherwise, "[t]he identity of the requesting party has no bearing on the merits" of a FOIA request at all. *Reporters Comm.*, 489 U.S. at 771.

Here the "party protected by the privilege," *id.*, is not Loving but rather the President of the United States. Loving's identity as a capital prisoner subject to Article 71(a) proceedings therefore "has no bearing on the merits" of his FOIA request, *id.*, nor do any constitutional rights that *Gardner* may afford him. Simply put, for the purposes of his FOIA request, Loving is no different than any other requester.

In sum, when executive privileges are at stake, *Julian* does nothing to alter standard Exemption 5 analysis, which asks only whether a document is "normally privileged," *FTC v. Grolier*, 462 U.S. at 28 (internal quotation marks omitted), regardless of the requester's identity or particular need for the document, *Sears, Roebuck & Co.*, 421 U.S. at 149 & n.16. Thus, the sole question we face is whether the requested documents would normally fall within the presidential communications privilege or the deliberative process privilege. We turn to that inquiry now.

### III.

Having rejected Loving's primary argument, we can easily affirm the district court's ruling that Documents 408, 499, and 86 are exempt from disclosure based on the presidential communications privilege. Documents 499 and 86 are memoranda from the Army and Defense Secretaries directly to the President advising him on his Article 71(a) review of Loving's capital sentence. Such memoranda fall squarely within the presidential communications privilege because they "directly involve" the President, *Judicial Watch*, 365 F.3d at 1114, and their confidentiality "ensure[s] that presidential decision-making is of the highest caliber, informed by honest advice and full knowledge," *In re Sealed Case*, 121 F.3d at 750.

Loving challenges the privilege's applicability to these two documents, quoting *Judicial Watch* for the proposition that "documents that are not 'solicited and received' by the President or his Office are instead protected against disclosure, if at all, by the deliberative process privilege," 365 F.3d at 1112, and claiming that no evidence demonstrates that the President "solicited and received" these two memoranda. But this requirement applies only to "*internal* agency documents," that is, "agency documents that are not submitted for Presidential consideration." *Id.* (emphasis added). Nothing in *Judicial Watch* disturbs the established principle that communications "directly involving" the President, *id.* at 1114—like Documents 499 and 86—are entitled to the privilege, regardless of whether the President solicited them. *See In re Sealed Case*, 121 F.3d at 751–52 (taking as indisputable that the presidential communications privilege includes "communications that directly involve the President").

Although not addressed directly to the President, Document 408 also falls within the presidential communications privilege. That document, which contains the Judge Advocate General's recommendation on Loving's capital sentence, was forwarded by the Army Secretary to the President. We agree with the district court that the President solicited and received Document 408 in a manner sufficient to bring it within the presidential communications privilege. Rule 1204(c)(2) of the Rules for Courts-Martial directs the Judge Advocate General to submit his recommendation so the President may act upon it, *see* MANUAL FOR COURTS-MARTIAL, R.C.M. 1204(c)(2) ("[T]he Judge Advocate General shall transmit . . . the recommendation of the Judge Advocate General to the Secretary concerned for the action of the President."), and it is the President who promulgates the Rules for Courts-Martial, *see Loving*, 517 U.S. at 770; 10

U.S.C. § 836(a). Furthermore, contrary to Loving's argument, Document 408 does not lose its privileged status simply because it traveled up the chain of command before the President received it. To be sure, *Judicial Watch* does suggest that documents subject to "various stages of intermediate review before . . . submi[ssion]" to the President might implicate the "confidentiality and candor concerns" animating the presidential communications privilege less so than direct communications with the President. 365 F.3d at 1115. But it announced this principle with respect to "documents and recommendations . . . that are not submitted [to] the President"—rather than those, like Document 408, that ultimately are. *Id.* at 1117; *see also id.* ("[A]ny . . . documents, reports, or recommendations that the [agency] submits to the Office of the President . . . remain protected.").

Loving argues that even if Documents 408, 499, and 86 qualify for the presidential communications privilege, that privilege is "'presumptive' and 'can be overcome by a sufficient showing of need.'" *Id.* Appellant's Opening Br. 26-27 (quoting *Judicial Watch*, 365 F.3d at 1113–14). The district court concluded, and the government now argues, that this principle is "inapplicable to FOIA, where the particular need of the applicant is not relevant." *Loving*, 496 F. Supp. 2d at 108. Although we have yet to address this question with respect to the presidential communications privilege, we have said with respect to the deliberative process privilege that "the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure." *In re Sealed Case*, 121 F.3d at 737 n.5. Because the presidential communications privilege "is more difficult to surmount" than the deliberative process privilege, *id.* at 746, we conclude that it, too, is insurmountable here.

This brings us finally to Document 87—a one-page memorandum from the Department of Defense Office of General Counsel to the Counsel to the President, which the district court found exempt from disclosure under the deliberative process privilege. Although not disputing that the document qualifies for the deliberative process privilege, Loving argues that the public interest in the document overcomes the privilege. He also argues that even if the privilege applies, the district court erred by failing to inspect the document to determine whether it contains segregable factual portions that may be disclosed.

*In re Sealed Case* forecloses the first argument for the reasons described above. 121 F.3d at 737 & n.5. The second claim fails as well. Although Loving is correct that the government has the "burden of demonstrating that no reasonably segregable information exists within . . . documents withheld" under the deliberative process privilege, *Army Times*, 998 F.2d at 1068, district courts have "broad discretion" to decide whether *in camera* review is necessary to determine whether the government has met its burden, *Armstrong v. Executive Office of the President*, 97 F.3d 575, 577–78 (D.C. Cir. 1996). Here the district court relied on the very factors that we have previously deemed sufficient for this determination, i.e., the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material. *See Johnson v. Executive Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("The combination of the *Vaughn* index and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated."). The district court thus acted well within its discretion when, without inspecting the document itself, it ruled that the government had demonstrated that Document 87 contained no segregable portions.

**IV.**

Because FOIA Exemption 5 covers the four documents Loving seeks, and because Loving sued under FOIA alone, we affirm.

*So ordered.*